UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| MIRANDA ANN LUNSFORD, | CASE NO. 3:20-CV-02655-JGC |
| Plaintiff, | JUDGE JAMES G.CARR |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Miranda Lunsford filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On November 30, 2020, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry of May 20, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Lunsford filed for DIB on July 26, 2018, alleging a disability onset date of April 1, 2018. (Tr. 125-26). Her claims were denied initially and on reconsideration. (Tr. 125, 138). She

then requested a hearing before an Administrative Law Judge. (Tr. 146-47). Ms. Lunsford (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on October 15, 2019. (Tr. 58). On January 29, 2020, the ALJ issued a written decision finding Ms. Lunsford not disabled. (*See* Tr. 31-45). The Appeals Council denied Ms. Lunsford's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Lunsford timely filed this action on November 28, 2020. (ECF #1).

## Factual Background

### I. Administrative Hearing

The following summarizes the testimony of Ms. Lunsford and VE Mark A. Pinti during the hearing before the ALJ.

Before Ms. Lunsford testified, her counsel gave an opening statement identifying Ms. Lunsford's main impairment as rheumatoid arthritis and the attending side effects of medication. (Tr. 60-61). He characterized the condition as uncontrolled and not responding to treatment. (*Id.*).

Ms. Lunsford lives with her husband. (Tr. 61). She completed high school. (*Id.*). Ms. Lunsford has a valid driver's license. (Tr. 63). She drove herself to the hearing but explained that she could not fully grip the steering wheel. (Tr. 87).

Ms. Lunsford quit smoking cigarettes at the end of August 2019. (Tr. 84). She does not drink alcohol or take recreational drugs or drugs that are not prescribed. (Tr. 84-85). Ms. Lunsford has limited social contact with her family because they live far away; she does not belong to a church or any social group. (Tr. 83). Ms. Lunsford and her husband have a German Shepherd. (*Id.*). Ms. Lunsford feeds the dog when her husband forgets. (*Id.*). Ms. Lunsford does not walk the dog because their yard is fenced. (*Id.*).

Ms. Lunsford is able to attend to her daily hygiene; she does not require help with showering, brushing her teeth, or styling her hair. (Tr. 63). Ms. Lunsford can shop for groceries, cook, mop, sweep, and do dishes and laundry. (Tr. 83). Ms. Lunsford has difficulty opening jars, even if they have already been unsealed. (Tr. 87). Her husband helps her with this daily. (*Id.*). Ms. Lunsford used to enjoy horseback riding, driving ATVs, and bowling; activities she is no longer able to do. (*Id.*).

Ms. Lunsford made changes to her daily routine to accommodate her problems with fine manipulation. (Tr. 91). She wears slip-on shoes, and pull-on pants without buttons or zippers. (*Id.*). She wears glasses instead of contact lenses. (*Id.*). Ms. Lunsford now uses an electric toothbrush to avoid the "extra gripping and pushing and using [her] fingers as much." (*Id.*).

On a typical day, Ms. Lunsford has morning stiffness and needs about four hours to get up and moving. (Tr. 82). She takes her medication, showers, and then does at least one thing around the house, such as run the vacuum or do a small load of laundry. (*Id.*). By about 1:00 or 2:00 p.m., Ms. Lunsford needs a nap because her medication has taken full effect. (*Id.*). Two or three times a week, Ms. Lunsford and her husband order take-out because she cannot manage to cook. (Tr. 86).

Ms. Lunsford had back surgery in 2015. (Tr. 90). She continues to have symptoms, including pain on the left side that travels down the leg and into the foot. (*Id.*). On some days, her foot tingles and feels like it is asleep. (*Id.*).

Ms. Lunsford treats with a rheumatologist for her rheumatoid arthritis. (Tr. 81). At the time of the hearing, Ms. Lunsford was working with her rheumatologist to find a medication regimen that would lead to remission. (*Id.*). Ms. Lunsford takes hydroxychloroquine daily and methotrexate every Thursday. (Tr. 88). Within an hour of taking methotrexate, Ms. Lunsford

experiences nausea and vomiting, and diarrhea begins within two to three hours. (*Id.*). The symptoms do not resolve until the following Wednesday. (*Id.*). Then, the process begins anew on Thursdays. (*Id.*).

Because of the medication, Ms. Lunsford reported extreme fatigue. (*Id.*) ("all I can think about is wanting to rest because I'm constantly up and down so much. So to me, nothing else really matters, except for trying to rest"). An anti-vomiting medication was effective until her methotrexate dosage was increased. (Tr. 92). Her rheumatologist recently added Humira injections to her treatment. (Tr. 89). Ms. Lunsford felt the Humira disrupted her sleep. (*Id.*). After the third injection, Ms. Lunsford began sleeping about three to three-and-a-half hours a night. (*Id.*). Ms. Lunsford explained she has to stay on methotrexate until her doctor can determine whether Humira is effective. (*Id.*).

Ms. Lunsford endorsed pain in her hands, shoulders, back, knees, and ankles. (Tr. 81). Physical activity aggravates her pain, whereas rest makes it better. (*Id.*). Ms. Lunsford offered that, when cleaning her house, the pain becomes so great that she cannot finish the task. (*Id.*). Ms. Lunsford used to be able to sweep, vacuum, mop, and clean her whole house in two hours. (Tr. 86). Now, to accommodate her pain, she must rest often, about every half hour. (*Id.*). It can take her up to three hours just to vacuum the house. (*Id.*).

Ms. Lunsford testified she has trouble gripping and has dropped a lot of things from her hands. (Tr. 80). On some days, she is unable to pick coins up from a table. (Tr. 91). She can stand for about twenty to twenty-five minutes before needing to sit and rest her feet. (Tr. 80-81). Ms. Lunsford can sit for about an hour before she needs to stand and walk. (Tr. 81). She can walk for

about ten minutes before she needs to sit due to pain that radiates from her back to her legs. (Tr. 82).

Ms. Lunsford last worked as an administrative assistant on a part-time basis for a financial firm until April 2018. (Tr. 63). Her position required typing on a keyboard for four to five hours a day, which caused hand swelling and radiating pain in her shoulders. (*Id.*). After seven months on the job, her hands began to swell to the point she could not open and close them. (Tr. 63, 64). In response to the ALJ's question, Ms. Lunsford testified she would be unable to perform a job that required her to sort a pile of nuts and bolts (defined as pushing them into one pile or another) because that sort of movement causes swelling and pain in her shoulders and arms. (Tr. 85).

The VE then testified. The ALJ summarized Ms. Lunsford's past relevant work from her lengthy employment history: administrative assistant, car salesperson, paint booth operator, sorter, packer, bottler, working supervisor, container builder, cashier, machine feeder, and manager of a fast-food restaurant. (Tr. 93).

The ALJ first asked the VE if a hypothetical individual could perform Ms. Lunsford's past relevant work if restricted to light exertion with the following limitations: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; no overhead reaching with the bilateral upper extremities; no foot controls with the bilateral lower extremities; frequent handling, finger, and feeling with the bilateral upper extremities; avoid exposure to all hazards such as unprotected heights and dangerous machinery; occasional exposure to humidity, wetness, and extreme temperatures; limited to two additional bathroom breaks, no more than five minutes in length; and must have a sit/stand option each hour to change position for two minutes. (Tr. 97-98). The VE testified such an individual could perform Ms. Lunsford's

past relevant work as an administrative assistant, car salesperson, and cashier. (Tr. 102). Other jobs available to the individual include parking lot cashier (DOT 211.426-010), merchandise marker (DOT 209.587-010) and inspector (DOT 741.687-010). (Tr. 103).

If, in addition to the above-referenced limitations, the hypothetical individual were restricted from using a keyboard, the individual would not be able to perform Ms. Lunsford's past relevant work but could work as an inspector, identified above. (Tr. 104-05).

A hypothetical individual limited to the restrictions identified in the ALJ's first question, but who is further limited to sedentary exertion cannot perform Ms. Lunsford's past relevant work but could perform as a document preparer (DOT 249.687-018), an order clerk (DOT 209.567-014), and a sorter (DOT 521.687-086). (Tr. 107). All sedentary work would be precluded if the hypothetical individual were restricted from using a keyboard. (Tr. 106).

If, under the original hypothetical, the individual were limited to occasional handling, fingering, and feeling with the upper extremities, all work would be precluded under both sedentary and light exertional levels. (Tr. 110).

The VE testified that employers do not tolerate employees being off task more than ten percent of the workday or being absent from work more than once a month. (*Id.*). Normal workday breaks occur every two hours. (Tr. 111). An employee gets two fifteen-to-twenty-minute breaks and a lunch break lasting thirty minutes to an hour. (*Id.*). The need to lie down during the workday outside of normal breaks is work preclusive. (Tr. 110). The need for four to five additional unscheduled restroom breaks each day is also work preclusive. (Tr. 111).

## II. PERSONAL AND VOCATIONAL EVIDENCE

Ms. Lunsford was 38 years old at the time of her alleged onset date, and 40 years old at the time of the administrative hearing. (Tr. 114). She completed her high school education. (Tr. 61). Ms. Lunsford has previously been employed as an administrative assistant, car salesperson, paint booth operator, sorter, packer, bottler, working supervisor, container builder, cashier, machine feeder, and manager of a fast-food restaurant. (Tr. 93).

## III. RELEVANT MEDICAL EVIDENCE

Lumbar spine studies from January and February 2017 revealed mild facet hypertrophy, postsurgical scarring in the epidural space and an associated focal disc bulge at L5-S1 without evidence of compression of the thecal sac or narrowing of the neural foramina. (Tr. 309-310).

In February 2017, Ms. Lunsford saw Edmund Lawrence, Jr., M.D., a neurosurgeon, for left-sided lower back pain radiating into her left leg and foot. (Tr. 298). Ms. Lunsford reported she can do very little to decrease her pain except change positions. (Tr. 304). She endorsed that standing and sitting for long periods of time causes swelling in her legs. (Tr. 305). Dr. Lawrence concluded Ms. Lunsford had displacement of a lumbar intervertebral disc without myelopathy and sent her to pain management for a left-sided foraminal nerve block. (Tr. 299).

In October 2017, Ms. Lunsford saw her primary care physician, Krishna Rai, M.D., for back pain. (Tr. 328). She displayed lumbar pain and tenderness. (*Id.*). Dr. Rai ordered a lumbar x-ray. (Tr. 330). Ms. Lunsford returned to Dr. Rai's office in November 2017 complaining of pain that traveled into her left hip. (Tr. 328).

A lumbar spine x-ray, dated November 18, 2017, revealed minimal disc bulging at L3-L4 and L4-L5 without significant spinal canal stenosis or neuroforaminal narrowing. (Tr. 294). At L4-

L5, Ms. Lunsford displayed a mild degree of bilateral facet joint disease. (*Id.*). Additionally, the x-ray revealed postsurgical changes at L5-S1 with residual granulation tissue along the left lateral recess and neural foramina, without significant effacement of the nerve root. (*Id.*).

In December 2017, Ms. Lunsford returned to Dr. Lawrence with persistent radicular left leg pain. (Tr. 301). Dr. Lawrence noted the radiologist's impression of some granulation tissue along the left lateral aspect of the thecal sac, suggesting some scarring. (*Id.*). Dr. Lawrence considered that an epidural block may be helpful. (*Id.*).

Ms. Lunsford returned to Dr. Rai's office in January 2018, complaining of left leg numbness and requesting a referral to a different neurosurgeon. (Tr. 326). In mid-February, Ms. Lunsford returned to Dr. Rai's office and noted that her back pain was stable with naproxen. (Tr. 325). By May 2018, Ms. Lunsford's back pain and radiating leg pain returned. (Tr. 316).

In July 2018, Ms. Lunsford complained of joint pain in her knees, wrists, and elbows. (Tr. 315). Dr. Rai diagnosed Ms. Lunsford with arthritis, referred her to a cardiologist for chest pain, prescribed Lasix for swelling, and ordered ANA (anti-nuclear antibody), rheumatoid factor, sedimentation rate, and uric acid testing. (*Id.*; Tr. 417). Later that month, Dr. Rai prescribed colchicine and duloxetine (Cymbalta) and referred Ms. Lunsford to a rheumatologist. (Tr. 314).

On July 24, 2018, Ms. Lunsford met with cardiologist Ravi Adusumilli, M.D. (Tr. 366). She complained of chest pain and swelling all over her body, beginning at the end of June. (*Id.*). She described the pain as localized "tightening" that radiated into her left shoulder, without associated shortness of breath, dizziness, palpations, syncope, nausea, or vomiting. (*Id.*). Ms. Lunsford reported that her primary care physician started her on Lasix initially and then prescribed "Colchicine (for Gout) and Duloxetine (Cymbalta) for ?Fibromyalgia last Saturday –

with improved chest pain." (*Id.*). Ms. Lunsford also complained of arthritis, joint pain, bloating, and abdominal pain. (Tr. 367). Dr. Adusumilli ordered a stress test and an echocardiogram. (Tr. 368).

Ms. Lunsford returned to Dr. Rai's office in August 2018 and complained of back pain, but stated it was better with Cymbalta. (Tr. 412). She displayed tenderness in her upper back. (*Id.*).

On October 18, 2018, Ms. Lunsford met with Michael Gordon, M.D., a rheumatologist. (Tr. 507). Dr. Gordon determined Ms. Lunsford had low-grade inflammatory arthritis involving her hands. (*Id.*). He noted Ms. Lunsford's complaint of numbness and tingling of the third and fourth fingers bilaterally, suggesting carpal tunnel syndrome. (*Id.*). She reported fatigue and that her hands, particularly her palms and thumbs, ache, throb, and feel tight. (Tr. 508). Ms. Lunsford reported difficulty dressing, getting in and out of bed, opening a milk carton, picking up clothes from the floor, and doing chores such as vacuuming or yardwork. (*Id.*).

Ms. Lunsford complained of neck pain, confirmed by a cervical spinal x-ray showing mild degenerative disc disease at C5-C6. (Tr. 507). On physical examination, Dr. Gordon noted tenderness in the second through fifth MCP joints bilaterally, and mild swelling bilaterally. (Tr. 509). Ms. Lunsford was able to make a fist. (*Id.*). Ms. Lunsford's wrists showed mild positive bilateral Tinel's sign. (*Id.*). The metatarsophalangeal (MTP) joints in her feet were tender to squeezing bilaterally. (*Id.*). Finally, Dr. Gordon noted Ms. Lunsford's lumbar spine range of motion was moderately limited to flexion, extension, lateral bending, and rotation. (*Id.*).

Dr. Gordon doubted Ms. Lunsford had gout and expressed concern for rheumatoid arthritis and fibromyalgia. (*Id.*). Dr. Gordon ordered laboratory testing, increased her prescription dose of naproxen, and ordered an EMG to rule out carpal tunnel syndrome. (*Id.*). Dr. Gordon

noted Ms. Lunsford takes "Cymbalta for presumed fibromyalgia" and recommended she continue taking it. (Tr. 508).

On October 31, 2018, Ms. Lunsford met with neurologist Syed Hasan, M.D. (Tr. 526). She complained of joint pain, swelling in the extremities, and a burning sensation across her low back from hip to hip. (*Id.*). Ms. Lunsford reported fatigue, painful joints, muscle cramping in her legs, cold intolerance, and easy bruising. (Tr. 528). Tinel's sign was negative bilaterally. (*Id.*). Dr. Hasan conducted the EMG study with normal results. (Tr. 523).

Ms. Lunsford returned to Dr. Gordon's office at the end of November 2018. (Tr. 550). There, she continued to complain of joint pain and had tenderness in her metacarpophalangeal (MCP) and MTP joints bilaterally. (*Id.*). She reported bilateral shoulder and arm pain, morning stiffness for two hours, mild swelling in her proximal interphalangeal (PIP) joints, and numbness and tingling in her hands. (Tr. 551). The naproxen helped some, according to Ms. Lunsford. (*Id.*). Physical examination revealed hand joint tenderness bilaterally with mild swelling. (Tr. 554). Ms. Lunsford had full range of motion in her wrists but displayed a mildly positive Tinel's signal bilaterally. (*Id.*). Her elbows, shoulders, hips, knees, and ankles were normal with full range of motion. (*Id.*). Her lumbar spine was moderately limited in flexion, extension, lateral bending, and rotation. (*Id.*). The MTPs in Ms. Lunsford's feet were tender to squeezing but were not swelled. (*Id.*). Dr. Gordon declined to make a definitive diagnosis at that time but noted leaning towards seronegative rheumatoid arthritis because Ms. Lunsford's symptoms had lasted for six months and she was having difficulties with activities of daily living. (Tr. 550). Dr. Gordon recommended treating Ms. Lunsford with disease-modifying antirheumatic drugs (DMARDs) and prescribed hydroxychloroquine sulfate (Plaquenil). (*Id.*).

In March 2019, Ms. Lunsford returned to Dr. Gordon's office with the same complaints of bilateral hand, shoulder, and arm pain and additional aches in her elbows and knees. (Tr. 547). She reported intermittent hand and PIP joint swelling, stiffness in the morning lasting four to five hours, continued numbness and tingling in her hands, and continued difficulty with performing daily activities. (*Id.*). Physical examination revealed tenderness and mild swelling of the MCPs bilaterally, but Ms. Lunsford could still make a fist. (Tr. 548). She displayed mildly positive Tinel's sign bilaterally and squeeze tenderness in her feet bilaterally without swelling. (*Id.*). Because Ms. Lunsford had not improved with Plaquenil, Dr. Gordon advised adding a more aggressive therapy, methotrexate, to her prescription regimen. (Tr. 546). He prescribed methotrexate, continued the Plaquenil and naproxen, and advised Ms. Lunsford to continue taking duloxetine. (*Id.*).

In April 2019, Ms. Lunsford reported seeing some improvement with methotrexate but noted nausea and diarrhea as initial side effects. (Tr. 542). Her diarrhea had improved but her nausea lasts a day or two after taking the methotrexate. (Tr. 543). Dr. Gordon prescribed Zofran to counteract the nausea caused by methotrexate. (*Id.*). Physical examination revealed the same hand and joint tenderness and mild swelling bilaterally, mildly positive Tinel's sign, and decreased lumbar spine range of motion, but was otherwise normal. (Tr. 544).

Ms. Lunsford returned to Dr. Gordon's office in May 2019. (Tr. 537). She reported improvement in her arthritis, but that she had good and bad days. (Tr. 538). Ms. Lunsford also reported that Zofran resolved the nausea she experienced with taking methotrexate. (*Id.*). Ms. Lunsford complained of hand pain, bilateral hip pain, and morning stiffness lasting four to five hours. (*Id.*). On physical examination, Ms. Lunsford had tenderness through all PIP and MCP joints bilaterally without swelling, mildly positive Tinel's sign, bilateral trochanter bursa tenderness

at the hips, bilateral ankle tenderness, foot tenderness to squeezing, and moderately limited lumber spine range of motion. (Tr. 540). Dr. Gordon increased methotrexate, and continued Ms. Lunsford's prescriptions for Plaquenil, naproxen, and Zofran. (Tr. 537).

In August 2019, Ms. Lunsford saw her family doctor after she bent down to plug something in and felt a pop in her back. (Tr. 573). Ms. Lunsford reported pain down both legs. (*Id.*). On physical examination, Ms. Lunsford had tenderness in her left sacroiliac joint. (Tr. 574). She received Mobic and an order for a lumbar spine MRI. (*Id.*). Ms. Lunsford returned about two weeks later and reported improved low back pain, though physical examination revealed continued sacroiliac joint tenderness. (Tr. 579). She was diagnosed with sacroiliitis and told to continue taking Mobic. (*Id.*).

On August 27, 2019, Ms. Lunsford returned to Dr. Gordon's office. (Tr. 583). Ms. Lunsford felt she was not responding to methotrexate and Plaquenil. (*Id.*). She complained of swollen joints in her hands and ankles, morning stiffness, numbness and tingling in her hands, and issues with gripping. (Tr. 584-85). Physical examination showed tenderness through all PIP and MCP joints bilaterally, synovial thickening at the second and third MCP joints bilaterally, mildly positive Tinel's sign bilaterally, bilateral ankle tenderness, and moderately limited lumbar range of motion. (Tr. 586). Dr. Gordon prescribed Humira and continued her other prescriptions for methotrexate, Plaquenil, and Zofran. (Tr. 583).

## IV. MEDICAL OPINIONS

In September 2018, Ryan O. Lakin, M.D., performed a consultative medical examination. (*See* Tr. 496-502). The report does not indicate whether Dr. Lakin relied on medical records to supplement Ms. Lunsford's recitation of her medical history. (*Id.*). According to the report, Ms.

Lunsford alleged chronic low back pain, fibromyalgia, and a history of gout. (Tr. 496). She reported undergoing a lumbar spine microdiscectomy in 2015 following a car accident and being diagnosed with fibromyalgia in 2018. (*Id.*). Ms. Lunsford had a gout flareup in July 2018 but is not on long-term medication for that condition. (*Id.*). Ms. Lunsford reported being able to do simple cooking, shopping, and cleaning. (*Id.*). She has difficulty walking through shopping malls and requires frequent breaks. (*Id.*). She is able to stand for thirty minutes before she needs a break. (*Id.*).

On physical examination, Ms. Lunsford displayed a normal musculoskeletal range of motion except she showed decreased range of motion at the dorsolumbar spine, bilateral hips, and bilateral knees, matching her complaints of pain in her lumbar spine, bilateral hips, and bilateral knees. (Tr. 497). Dr. Lakin noted Ms. Lunsford's hands appeared normal, without clubbing, cyanosis, or edema; her upper extremity pinch, grasp, and fine and gross manipulation were normal; and Tinel's and Phalen's signs were negative. (*Id.*). Ms. Lunsford could perform heel-to-toe and tandem walking without difficulty, was able to stand on one leg at a time, and had no trouble getting on and off the examination table. (Tr. 498).

Dr. Lakin diagnosed chronic low back pain, chronic bilateral hip and knee pain, and fibromyalgia. He concluded Ms. Lunsford could lift and carry five to ten pounds frequently, eleven to twenty pounds occasionally; sit continuously with regular breaks; and stand and walk frequently with regular breaks. (Tr. 498). He added that "ADLs, travel, and communication are normal." (*Id.*).

Before Ms. Lunsford's rheumatologist started treating Ms. Lunsford for possible seronegative rheumatoid arthritis, she claimed disability due to a back injury, gouty arthritis, and fibromyalgia. (Tr. 115, 127). State agency medical consultants reviewed Ms. Lunsford's medical

records and concluded she had severe medical impairments of discogenic and degenerative back disorder, obesity, gout, and fibromyalgia. (Tr. 119, 132). On initial consideration, Kalpna Desai, M.D., concluded Ms. Lunsford could lift and carry twenty pounds occasionally, ten pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds; and occasionally stoop, kneel, crouch, and crawl. (Tr. 121).

On reconsideration, Ms. Lunsford alleged new pain, tingling, and numbness in her hands and arms and feeling tired all the time. (Tr. 127). William Bolz, M.D., affirmed Dr. Desai's findings. (Tr. 134-35).

In September 2019, Ms. Lunsford's rheumatologist, Michael A. Gordon, M.D., completed a physical medical source statement. (*See* Tr. 569-70). He began treating Ms. Lunsford in October 2018. (Tr. 569). Dr. Gordon diagnosed Ms. Lunsford with rheumatoid arthritis and identified the signs and symptoms Ms. Lunsford exhibited, including recurrent nausea and diarrhea, low back pain radiating down her left buttock, leg, and foot, and bilateral hand pain and swelling. (*Id.*). He also identified positive clinical findings, including bilateral positive Tinel's sign in her wrists, mild degenerative disc findings on x-ray, and swelling at the extremities. (*Id.*). Dr. Gordon noted Ms. Lunsford's medications caused the following side effects: drowsiness/sedation, fatigue, nausea/vomiting, and lowered immunity to infection. (*Id.*). The doctor indicated Ms. Lunsford's rheumatoid arthritis would likely produce "good days" and "bad days," and opined she would be absent from work about four days per month. (Tr. 570).

Dr. Gordon opined Ms. Lunsford's symptoms would be severe enough to interfere with her attention and concentration such that she would be off task more than twenty-five percent of

the workday. (Tr. 569). While Ms. Lunsford could perform detailed or complicated tasks and handle frequent interactions with others, she would be unable to perform routine tasks at a consistent pace, and she would be unable to perform fast-paced tasks. (*Id.*). Dr. Gordon indicated Ms. Lunsford could stand and walk for less than two hours, and sit for about two hours, in an eight-hour workday. (Tr. 570). He also concluded Ms. Lunsford would need ready access to a restroom and four to five unscheduled restroom breaks each workday. (*Id.*).

In response to the medical source statement questionnaire, Dr. Gordon opined that Ms. Lunsford is limited to part-time work at best and could work four hours a day, twenty hours a week in a sedentary position with breaks. (*Id.*).

## V. Other Relevant Evidence

Ms. Lunsford completed an Adult Function Report on August 21, 2018, detailing how her conditions limit her activities. (*See* Tr. 235-42). Ms. Lunsford reported her back and leg pain are so bad some days that she can barely get out of bed. (Tr. 235). She must switch between sitting and standing often. (Tr. 236).

Before her conditions began affecting her, Ms. Lunsford was able to ride horses, drive four-wheelers, take down and hang curtains, and rearrange furniture in her home. (*Id.*). Ms. Lunsford can cook simple meals and perform household chores, including small loads of laundry and light cleaning. (Tr. 236-37). She used to bake all the time but cannot stand that long anymore to prepare meals. (Tr. 237). Ms. Lunsford shops for groceries about once a week for an hour. (Tr. 238). On a regular basis, Ms. Lunsford leaves the house to go to the grocery store and to medical appointments. (Tr. 239). She does not go to crowded places anymore for fear of getting knocked down. (Tr. 240).

Ms. Lunsford enjoys watching television, crocheting, and sitting on her swing outside. (*Id.*). She engages in these activities whenever she can but cannot sit for long periods of time because of her back so she does not do any activity for very long. (*Id.*). She spends time talking and sitting with others once or twice a week. (*Id.*).

Ms. Lunsford has difficulty sleeping more than two hours at a time. (Tr. 236). She endorsed issues with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing, stating that these movements pull at her back and legs, causing pain. (Tr. 240). Ms. Lunsford estimates she can only lift up to twenty pounds. (*Id.*). She can walk about thirty minutes before needing to stop and rest for about fifteen or twenty minutes. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated January 29, 2020, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since April 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine with remote history of laminectomy in 2015; mild degenerative disc disease of the cervical spine with osteophytes; rheumatoid arthritis of the bilateral hands and bilateral feet without rheumatoid factor; fibromyalgia; gout; cervicalgia; and obesity. (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: she can occasionally climb ramps and

> stairs, never climb ladders, ropes, or scaffolds, and can occasionally balance, stoop, kneel, crouch, and crawl. She is limited to no overhead reaching with her bilateral upper extremities. She is limited to no foot controls with the bilateral lower extremities. She is limited to frequent handling, finger, and feeling with the bilateral upper extremities. She can never work around hazards, such as unprotected heights or moving dangerous mechanical parts. She can occasionally work in condition of humidity and wetness, in conditions of extreme heat or cold. She is limited to two additional bathroom breaks per workday of no more than five minutes each and will remain on task 95% of the time.
>
> 6. The claimant is capable of performing past work as an Administrative Assistant, DOT Code 209.562-010, SVP 3, light exertional level work as classified by the DOT, performed at the sedentary level by the claimant, and as a Cashier, DOT Code 211.462-018, SVP 3, light exertional level work as classified by the DOT, and performed at the light exertional level by the claimant. Other work available to the claimant includes Parking Lot Cashier, DOT Code 211.462-010, SVP 2, light exertional level; Merchandise Marker, DOT Code 209.587-010, SVP 2, light exertional level; and Inspector, DOT Code 741.687-010, SVP 2, light exertional level.
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2018, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 33-45).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d

830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Lunsford takes issues with the ALJ's evaluation of the medical opinions of Dr. Lakin and Dr. Gordon, and of Ms. Lunsford's complaints of pain. (Pl.'s Br., ECF #17, PageID 677). Additionally, Ms. Lunsford argues she is entitled to a Sentence Six remand based on new and material evidence. (*Id.*). I address each assertion in turn.

**Medical Opinion Evaluation**

Ms. Lunsford alleges the ALJ erred in finding Dr. Lakin's consultative examination report persuasive because Dr. Lakin did not know of the rheumatoid arthritis diagnosis when he examined Ms. Lunsford, and that later submitted medical evidence makes Dr. Lakin's opinion less persuasive. (*Id.* at PageID 684, 686). Ms. Lunsford argues that a medical opinion "that does not consider the severe impairment of rheumatoid arthritis cannot be considered persuasive and consistent with the evidence" where her treating rheumatology specialist documented pertinent rheumatoid arthritis findings, including tenderness, swelling, positive Tinel's sign, and synovial thickening. (*Id.* at PageID 686). In addition, Ms. Lunsford argues Dr. Lakin's diagnosis of fibromyalgia is inconsistent with other medical evidence because no other provider diagnosed fibromyalgia. (*Id.* at PageID 685). The Commissioner responds that substantial evidence supports the ALJ's evaluation of Dr. Lakin's medical opinion and that the ALJ properly focused on objective medical findings and resulting functional limitations as opposed to diagnoses when the ALJ considered the supportability and consistency of the medical opinion. (Comm'r's Br., ECF #19, PageID 703-04).

Because Ms. Lunsford filed her application after March 27, 2017, her case is evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these regulations, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 404.1520c(b).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at § 404.1520c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[1] and consistency.[2] 20 C.F.R. § 404.1520c(b). An ALJ must explain how the ALJ considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 404.1520c(b)(2), (3). The ALJ is required to say enough in the decision to allow this Court to trace the path of reasoning. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011).

Here, the ALJ concluded Dr. Lakin's medical opinion was persuasive because it was consistent with the evidence of record. (Tr. 42). She noted that Dr. Lakin's findings were largely normal, with the exception of decreased range of motion in the dorsolumbar spine, hips, and

---

[1] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1).

[2] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2).

knees. (Tr. 41-42). These findings support Dr. Lakin's diagnoses of chronic low back pain and chronic bilateral hip and knee pain. (Tr. 42). The ALJ found Dr. Lakin's opinion consistent with imaging confirming no significant postsurgical changes to Ms. Lunsford's lumbar spine, a normal upper extremity EMG test, and an August 2019 examination with her family care physician showing no edema. (*Id.*).

I find no error with the ALJ's evaluation of Dr. Lakin's medical opinion. She discussed Dr. Lakin's findings (decreased range of motion in lumbar spine, hips, and knees) and his corresponding diagnoses (chronic low back, hip, and knee pain). She found Dr. Lakin's opinion that Ms. Lunsford is capable of light work consistent with other medical evidence in the record, including medical records postdating Dr. Lakin's examination. The ALJ appropriately articulated how she considered Dr. Lakin's opinion.

Ms. Lunsford additionally argues Dr. Lakin's opinion should be considered less persuasive because his diagnosis of fibromyalgia is inconsistent with the medical record where no other provider made such a diagnosis. (Pl.'s Br., ECF #17, PageID 685). However, Ms. Lunsford herself reported to Dr. Lakin that she had been diagnosed with the condition. (*See* Tr. 496). Moreover, an ALJ's evaluation is concerned with medical opinions, not diagnoses. The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [her] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2).

As to Dr. Gordon's opinion that Ms. Lunsford is limited to sedentary work, Ms. Lunsford argues the ALJ should have considered it persuasive because Dr. Gordon supported his opinion with findings of tenderness, swelling, synovial thickening, and mildly positive Tinel's sign, and his opinion is consistent with Ms. Lunsford's family doctor running laboratory testing because he suspected rheumatoid arthritis. (Pl.'s Br., ECF #17, PageID 688). Ms. Lunsford also takes issue with the ALJ not considering the other factors in § 404.1520(c), such as the treating relationship and the medical provider's specialization. (*Id.* at PageID 687).

The ALJ's evaluation, however, appropriately articulated the supportability and consistency of Dr. Gordon's opinion when she concluded the opinion was unpersuasive. First, the ALJ noted that Dr. Gordon's limitations were not supported by the record. (Tr. 42). While Ms. Lunsford usually endorsed joint tenderness, Dr. Gordon's physical examination often revealed only mild swelling or no swelling at all. (*See* Tr. 42; *compare id. with* Tr. 540, 544, 548, 554, 586). In addition, Dr. Gordon always described the Tinel's sign as "mildly positive." (*See* Tr. 42; *compare id. with Tr.* 540, 544, 548, 554, 586). The ALJ also considered the opinion's consistency with other evidence. (Tr. 42). She found Dr. Gordon's limitations inconsistent with the normal upper extremity EMG findings, the spinal imaging showing no significant postsurgical changes, and the mild cervical spine degenerative disc disease. (*Id.*).

Having articulated the supportability and consistency of Dr. Gordon's opinions, the ALJ did not err in her evaluation. Moreover, the ALJ was not required to consider Dr. Gordon's treating relationship with Ms. Lunsford or his specialization in rheumatology because the ALJ did not find Dr. Gordon's opinion equally persuasive with another medical opinion. Because the ALJ's opinion is supported by substantial evidence, I find no basis to recommend it be set aside.

**Subjective Symptom Evaluation**

Next, Ms. Lunsford argues the ALJ erred in her evaluation of Ms. Lunsford's complaints of pain by not considering all of the factors set forth in § 404.1529 and SSR 16-3p. (Pl.'s Br., ECF #17, PageID 688). More particularly, Ms. Lunsford takes issue with the ALJ failing to evaluate the type, dosage, and effectiveness of the medication taken to alleviate symptoms and the changes Ms. Lunsford made to her life to accommodate her conditions, including wearing clothing without buttons or zippers, wearing slip-on shoes, and switching to an electric toothbrush. (*Id.* at PageID 689-90).

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief from pain or other symptoms; (6) any measures other than treatment an individual uses or used to relieve pain or other symptoms; and (7) any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms. *Id*. The ALJ is not required to analyze all seven factors, but only those factors germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)

("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ finds it inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, despite Ms. Lunsford's contrary arguments, the ALJ considered Ms. Lunsford's medication regimen, including the increase in dosage and the side effects. She noted Ms.

Lunsford's nausea resolved when she took Zofran before her dose of methotrexate. (Tr. 40). Ms. Lunsford also endorsed some improvement with medications. (Tr. 40).

Moreover, the ALJ appropriately considered the objective medical evidence in relation to Ms. Lunsford's complaints. While Ms. Lunsford complained of numbness and tingling in her hands, an EMG study of her upper extremities was normal. (*Id.*). While Ms. Lunsford complained of hand pain, swelling was often non-existent or mild on examination. (Tr. 39-40). Ms. Lunsford offers no compelling reason to disturb the ALJ's analysis.

Furthermore, it is apparent the ALJ did not completely discount Ms. Lunsford's subjective statements of pain because she limited Ms. Lunsford to no overhead reaching, no foot controls, and only occasional exposure to extreme temperatures. (Tr. 41). In addition, she provided a limitation to handling, fingering, and feeling with the upper bilateral extremities, noted Ms. Lunsford should receive two additional unscheduled bathroom breaks during the workday, and provided Ms. Lunsford a sit-stand option to accommodate her pain. (*Id.*).

**Sentence Six Remand**

Finally, Ms. Lunsford argues she is entitled to a Sentence Six remand. (Pl.'s Br., ECF #17, PageID 690). Sentence Six of 42 U.S.C. § 405(g) permits the Court to remand the case for further administrative proceedings without ruling on the merits. A claimant seeking a Sentence Six remand bears the burden of showing (1) the evidence at issue is both new and material, and (2) good cause excusing the failure to incorporate such evidence into the record in a prior proceeding. *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986); *see also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

Evidence is new if it was not in existence or available to the claimant at the time of the administrative proceeding. *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). Thus, evidence available during the pendency of the administrative proceedings that was not obtained and submitted to the Commissioner in a timely manner does not qualify as "new evidence." *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477 (6th Cir. 2006).

Evidence is material if "a reasonable probability" exists that the Commissioner "would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). A post-decision evaluation is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition. *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 277-278 (6th Cir. 2010); *see also Jones*, 336 F.3d at 478 (evidence of subsequent deterioration in condition deemed immaterial); *Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) (same).

Finally, as to the good cause requirement, the Sixth Circuit applies a stringent standard under which a claimant must provide a valid reason for failing to obtain the additional evidence during the administrative proceedings. *Oliver*, 804 F.2d at 966. "A claimant shows good cause by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Ferguson v. Comm'r*, 628 F.3d 269, 276 (6th Cir. 2010) (internal quotations and citations omitted).

Ms. Lunsford provided the Appeals Council with three additional medical records. The first, dated December 17, 2019, is an appointment with Dr. Gordon. (Tr. 50-55). Ms. Lunsford reported feeling much better since starting Humira; she noted less joint pain, swelling, and tenderness. (Tr. 50-51). Ms. Lunsford indicated she was tolerating the medication well. (*Id.*). While

she continued to have neck and back pain, she described the pain as tolerable. (*Id.*). On physical examination, Ms. Lunsford's hands continued to display synovial thickening at the second and third MCP joints bilaterally but did not have hand tenderness. (Tr. 53). She had normal range of motion without tenderness or swelling of the ankles, wrists, elbows, and shoulders. (*Id.*). Ms. Lunsford's hips and knees exhibited full range of motion without pain. (*Id.*). The only abnormal finding was a moderately limited range of motion in the lumbar spine. (*Id.*). Dr. Gordon continued Ms. Lunsford's medications and directed her to follow up in four months. (Tr. 50-51).

The second record Ms. Lunsford supplied was from her family doctor, dated January 30, 2020. (Tr. 19-21). At that time, she reported her low back pain as stable. (Tr. 19). Ms. Lunsford displayed tenderness at the left sacroiliac joint; her physical examination was otherwise normal. (Tr. 20). Ms. Lunsford was instructed to return in six months. (*Id.*).

Third, Ms. Lunsford offered a narrative report from Dr. Gordon, dated March 9, 2020, that discussed the nature of Ms. Lunsford's treatment, including the necessity to continue trying different drug therapies after limited improvement. (Tr. 17) (noting in February 2020, Dr. Gordon decreased the interval between Humira injections "because she was not doing well."). Dr. Gordon explained that Ms. Lunsford's condition affects both her upper and lower extremities, causing swelling and pain the joints, and that her medications cause frequent nausea and diarrhea, which affects her ability to concentrate. (*Id.*). Dr. Gordon also clarified his medical records: "Concerning my office notes that give the impression that Ms. Lunsfor [*sic*] is not disabled, she is doing as well as expected because most patients on methotrexate, Plaquenil, and Humira have frequent side effects including fatigue, nausea and diarrhea." (*Id.*). Lastly, Dr. Gordon reiterated his opinion that

Ms. Lunsford cannot work full time and would "at best be able to do some part-time sedentary work with 2 or 3 extra breaks every hour and no more than four hours in a workday." (*Id.*).

Ms. Lunsford argues these items are new evidence because they were not in existence at the time of the hearing. (Pl.'s Br., ECF #17, PageID 691). She claims the evidence is material, meaning there is a reasonable probability that the Commissioner would reach a different disposition if presented with the new evidence, because "Dr. Gordon states in no equivocal language that Ms. Lunsford had specific functional limitations caused by her rheumatoid arthritis that has not responded to multiple treatment medications." (*Id.*). As to good cause, Ms. Lunsford claims that at the time of the hearing, "she and Dr. Gordon were hopeful that this would be the treatment that worked." (*Id.* at PageID 691-92).

The Commissioner responds that the Appeals Council explicitly considered the evidence and declined to review. (Comm'r's Br., ECF #19, PageID 707-08). This is supported by the Appeals Council's denial of Ms. Lunsford's request for review, which addresses the three medical records, and states: "We find this evidence does not show a reasonable probability that it would change the outcome of the decision." (Tr. 1-4).

While the proffered evidence is new, in that it was not in existence at the time of the October 15, 2019 hearing before the ALJ, I find it is not material because Ms. Lunsford has not shown a reasonable probability the ALJ would have reached a different disposition using this evidence. The first two new records suggest Ms. Lunsford's condition was *improving*; such records would not prompt a reasonable ALJ to reach a conclusion opposing the ALJ's in this case. The third document, the narrative report from Dr. Gordon, evidences a subsequent deterioration in Ms. Lunsford's condition after the hearing and the December 17, 2019 medical record. This

information is not material because it does not speak to Ms. Lunsford's condition at the time of the hearing.

Additionally, the evidence from Dr. Gordon is cumulative. His narrative report consists of the same clinical findings and side effects of medication that are present in Ms. Lunsford's medical records predating the hearing, including pain in the joints, swelling in the extremities, positive Tinel's sign, and the attending nausea, diarrhea, and fatigue from her medications. (*See* Tr. 17, 540, 544, 548, 554, 586). The ALJ determined Ms. Lunsford was not disabled based on that same evidence, which suggests there is not a reasonable probability the evidence would prompt a different disposition.

Having failed to show that the evidence post-dating the hearing is material and non-cumulative, I find that Ms. Lunsford has not shown entitlement to a Sentence Six remand. Therefore, I recommend that the District Court deny her request for a remand.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the Commissioner's decision denying disability insurance benefits be affirmed.

Dated: April 6, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R.**

Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).